Morris A. Stoltzfus and Ruth E. Stoltzfus v. Commissioner. M. A. Stoltzfus, Inc. v. Commissioner.
Stoltzfus v. Comm'r
Docket Nos. 3827-67 and 3828-67. United States Tax Court
T.C. Memo 1970-337; 1970 Tax Ct. Memo LEXIS 23; 29 T.C.M. (CCH) 1610; T.C.M. (RIA) 70337; December 10, 1970, Filed *23 Morris A. Stoltzfus and corporate petitioner engaged in certain horse-related activities during the years at issue and deducted certain expenses with respect thereto which the Commissioner disallowed on the ground that neither petitioner was engaged in a trade or business in connection with these disallowed items. Respondent also included certain items as additional income to individual petitioners. Held, individual petitioner was not engaged in the business of breeding, raising, and selling American saddle bred horses in 1961 since he lacked requisite profit-making intention. Accordingly, disallowed deductions were proper. However, he was so engaged in 1962. Disallowed amounts were improper. Held, further, petitioner-corporation was not engaged in any profit-motivated business with respect to its horse activities during its fiscal years ended October 31, 1961, and October 31, 1962. Therefore, disallowed deductions were proper. However, redetermination necessary as to additional income to individual petitioners in 1962. Held, further, petitioner-corporation was engaged in saddle horse business during the taxable years ended October 31, 1963, and October 31, 1964, respectively. *24 Disallowed amounts were improper. Howell C. Mette, State Street Bldg., 500 North 3rd St., P.O. Box 727, Harrisburg, Pa., and Charles B. Zwally, for the petitioners. Stephen P. Cadden, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: The Commissioner determined deficiencies in the individual petitioners' income taxes as follows: CalendarYear
Deficiency
1961
$ 4,451.55
1962
42,757.21
1963
85,793.92 He also determined deficiencies in the income taxes of petitioner-corporation in the following amounts: FY Ended
Deficiency
10-31-61
$ 3,783.28
10-31-62
3,308.25
10-31-63
42,430.81
10-31-64
25,089.01
The primary issue [1] for our decision is whether the horse activities *25 conducted first by Morris A. Stoltzfus and then allegedly undertaken by M. A. Stoltzfus, Inc., constituted a trade or business entered into for profit, so that the expenses attributable thereto are deductible. In the event that we resolve that issue in the negative, there are a number of subsidiary issues for our determination, all of which relate to the horse venture: Docket No. 3827-67 1. Whether the individual petitioners received additional income of $600 in 1961 as a result of the purchase of a horse cart and harness by petitioner-corporation. 2. Whether the individual petitioners claimed unallowable deductions of $4,951.86 in 1961. 3. Whether the individual petitioners received additional income of $1,881.79 in 1962, as a result of the disallowance of certain deductions claimed by the corporate petitioner. 4. Whether the individual petitioners received $38,900 in 1962 as a result of petitioner-corporation's purchasing five horses. 5. Whether the individual petitioners claimed unallowable deductions of $21,518.86 in 1962, as expenses relating to horse activities. *26 6. Whether claimed investment credits should be disallowed to the individual petitioners to the extent of $338.35 for 1962. 7. Whether the individual petitioners received additional taxable income of $68,833.36 in 1963 growing out of horse expenses paid by M. A. Stoltzfus, Inc. 8. Whether the individual petitioners received additional taxable income of $1,512 and $37,500 in 1963 growing out of tack room improvements made by petitioner-corporation and horses purchased by it. 9. Whether the individual petitioners claimed unallowable deductions for depreciation of $2,307.65 on stable and equipment allegedly 1611 rented by the individual petitioners to M. A. Stoltzfus, Inc. 10. Whether the individual petitioners claimed investment credit of $320.54 for 1963 for depreciable furniture and fixtures for the stable, costing $4,579.20, allegedly acquired for renting said stable to M. A. Stoltzfus, Inc., in its trade or business, should be disallowed. Docket No. 3828-67 11. Whether the following deductions claimed by M. A. Stoltzfus, Inc., the corporate petitioner, relating to saddle horse activities should be disallowed as being assets acquired or expenditures made primarily *27 for the personal benefit of the controlling stockholder, Morris A. Stoltzfus: FY Ended
Amount
10-31-61
$ 90.00
10-31-62
6,394.00
10-31-63
89,919.50
10-31-64
122,137.09
12. Whether the following claimed net operating loss deductions carrybacks by M. A. Stoltzfus, Inc., the corporate petitioner, from fiscal year ended October 31, 1964, should be disallowed, as determined: FY Ended
Amount
10-31-61
$12,610.92
10-31-62
11,434.19
10-31-63
58,630.90
13. Whether the claimed investment credit by M. A. Stoltzfus, Inc., the corporate petitioner, of $770 and $105.84 for fiscal year ended October 31, 1963, should be disallowed. Findings of Fact The parties have stipulated some facts which, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners Morris A. Stoltzfus (sometimes hereinafter referred to as petitioner or Stoltzfus) and Ruth E. Stoltzfus (sometimes hereinafter referred to as Ruth), husband and wife who resided in Talmage, Pa., at the time of the filing of the petition herein, timely filed joint Federal income tax returns for the calendar years 1961, 1962 and 1963, respectively, with *28 the district director of internal revenue, Philadelphia, Pa. They reported their income for those years on the cash receipts and disbursements method. Petitioners have two daughters, Marianne E. Nordstrom (referred to sometimes as Marianne) and Ruth Louise Jones (sometimes referred to as Ruth Louise). Marianne was born on April 5, 1937, and Ruth Louise on May 14, 1940. M. A. Stoltzfus, Inc. (sometimes referred to as MAS or petitioner-corporation), was incorporated in Pennsylvania on February 6, 1957, and has its principal place of business in Talmage, Pa. MAS, which reported its income on the accrual method, timely filed U.S. corporation income tax returns for the taxable years ended October 31, 1961, through October 31, 1964, respectively, with the district director of internal revenue, Philadelphia, Pa. Petitioner Morris A. Stoltzfus and his father Daniel M. Stoltzfus had operated quarry enterprises for many years. In 1949, this business was incorporated in Pennsylvania under the name D. M. Stoltzfus & Son, Inc. (hereinafter DMS), and was operated by petitioner and his father until the latter's death in February 1956, at which time petitioner continued the management of that *29 corporation. From January 1, 1960, until the time of the trial herein, petitioner was the president and primary management executive of DMS, which operates a large limestone quarry in Talmage, Pa., and other quarries in Pennsylvania and Maryland, and is also engaged in the production and sale of crushed stone, aggregates, and related products, and in the paving construction business. Petitioner has also served as president and principal management official of the following corporations which have business related to the quarry business of DMS: 1. Pennsylvania Aggregates, Inc., which is engaged in quarrying and holding quarry reserve land; 2. Becker Company, Inc., which engages in trucking and hauling stone in interstate commerce; 3. M. A. Stoltzfus, Inc., the petitioner-corporation, which is engaged in rock and earth drilling, holding quarry reserve land, and farming, grazing, and breeding cattle thereon; and 4. Lancaster Construction Company, which is engaged in paving construction business. At the time of the trial herein, the estimated sales volume of DMS and these four related companies was five or six million dollars per year. 1612 Petitioner's duties and *30 responsibilities with respect to these companies occupy his time six or seven days a week and twelve to fourteen hours a day. The following table indicates data relevant to the capital stock of MAS: Stockholder
Number of
Description
Par Value
Date
Shares
of Stock
Per Share
Issued
Marianne E. Nordstrom
100
Nonvoting Class A.
Common
$ 100
Nov. 1957
Ruth Louise
Jones
100
Nonvoting
Class A.
Common
100
Nov. 1957
Morris A.
Stoltzfus
50
Voting Class
B. Common
100
Feb. 1957
TOTAL CAPITAL
STOCK
$ 25,000
Dividends may be paid to holders of class A common stock without payment of dividends on class B common stock. However, no dividends can be paid to class B common stockholders without payment of an equal or greater amount per share to class A common stockholders. Except for the different voting and dividend rights between the two classes of stock, the rights of the stockholders thereof are identical. During the calendar years 1962 to 1966, the officers of MAS were the following persons: Name
Office
Morris A. Stoltzfus
President
Marianne E. Nordstrom
Vice President
John Beyer
Secretary
Ruth E. Stoltzfus
Assistant Secretary
Morris A. Stoltzfus
Treasurer
*31 From 1966 to the date of the trial, the officers of petitioner-corporation were: Name
Office
Morris A. Stoltzfus
President
Ruth E. Stoltzfus
Vice President
John Beyer
Secretary
Marianne E. Nordstrom
Assistant Secretary
Ruth Louise Jones
Treasurer
Marianne and Ruth Louise actively participated in the business affairs of their father during the years 1960 to 1967. They had full access to all financial records of MAS and were listed as employees by DMS and the other related companies during those years. More particularly, Marianne has been employed by the Stoltzfus companies since the age of 15. Her duties consisted of maintaining trucking records and posting accounts payable and receivable for Becker Company, Inc.; keeping job costs for each job of Lancaster Construction Company; keeping payroll records, assisting in the preparation of quarterly tax returns, keeping paving job costs, preparing checks for salaried truckers, and assisting in the billing and pricing department of DMS; and preparing payroll, posting cash disbursements and preparing checks for MAS. Ruth Louise was first employed on a part-time basis by the corporations managed by her father *32 at 16 years of age. Upon graduating from Southern Seminary and Junior College in Virginia in June 1960, Ruth Louise began to work on a full-time basis for the Stoltzfus companies. Her duties varied, but she worked primarily in the credit department where she collected accounts receivable, assisted in preparing payroll and payroll tax reports of DMS and in preparing checks and payroll for MAS. In addition to the aforesaid duties, Ruth Louise also participated in the horse operations in question. From the fall of 1961 until December 1964, she did all the general office work and correspondence with respect thereto, which included obtaining mortality insurance on the horses and registering the horses with different breeders' associations. During the same period, Ruth Louise served as an amateur rider, which required her to practice almost every day riding different horses. The purpose of her riding was to demonstrate to the public at horse shows that an amateur female rider was able to handle such horses, and thereby interest people in buying these horses for themselves or their children. Marianne, however, was not interested in horses because of an experience she had prior to the *33 years in question in which a horse she was riding became uncontrollable. Thereafter, she never rode again. On November 6, 1957, petitioner transferred to the newly incorporated MAS his drilling enterprise as well as an interest in a quarry lease. Thereafter, MAS purchased, from time to time, various tracts of real estate to serve as quarry reserve property. In particular, MAS desired a source of shale, which is used to produce a light-weight 1613 aggregate. Speculating that a shale light-weight aggregate might be specified for use in constructing bridge decks for the new Maryland turnpike and aware of the results of certain tests which indicated the presence of shale and limestone deposits in three tracts of farm land in Warwick Township, Lancaster County, Pa., the management of MAS authorized the purchase in 1959 of this land which contained 148 acres and was known as Garmen Farm Number 2. Petitioner-corporation has utilized Garmen Farm Number 2 since its acquisition for raising hogs and cattle, approximately 125 head, and for the production of grain, wheat, barley and corn. From the date of its incorporation until the time of the trial, MAS was restricted by the terms of *34 its corporate charter to engage in quarry and related activities. In addition to the aforesaid farming and livestock operation of Garmen Farm Number 2, petitioner supervised, on a part-time basis, the management of two other farm operations: 1. Garmen Farm Number 1 owned by the individual petitioners and used for raising about 125 head of steers and producing corn, wheat and barley; and 2. Bards Crossing Farm, a 94-acre farm with improvements located in Upper Leacock Township, Lancaster County, Pa., which was purchased years ago by Daniel M. and Lydia Z. Stoltzfus, the parents of petitioner, and was leased to him by his mother for the purpose of raising steers after his father died in 1956. The cattle operations of MAS produced the following financial results during the years indicated: Year Ended
Year Ended
October 31, 1960
October 31, 1961
Sale of Cattle
$ 31,579.59
$ 27,877.96
Cost of Cattle
20,978.30
18,765.30
Net Gain
$ 10,601.29
$ 9,112.66
Respondent's agent, Thomas A. Gannon, conducted an audit examination of both petitioner and MAS. It has been stipulated that the agent, if called upon to testify, would do so as set forth in his "Report *35 of Audit Examination" dated March 16, 1965, which was introduced into evidence. In his audit report, he concluded that the losses incurred from the farm and cattle operations of the individual petitioner and of MAS could not be successfully challenged. He enumerated four factors underlying his conclusion. They were: (1) there is substantial income derived from the farm; (2) there is a full-time employee supervising the farm; (3) Stoltzfus does not reside on the farm; and (4) there was no indication that petitioner is "personally interested" in steers or hogs. Petitioner has been interested in and engaged in farming and breeding livestock practically all of his life. In fact, he was born and reared on a farm which his father owned and operated. In addition to his interest in and activities with regard to farming and livestock petitioner has always been interested in horses because of his family background. His father and grandfather were both reputed and successful horse dealers in Lancaster County, Pa. Moreover, in the formative years of his father's quarry business, at a time when power driven vehicles were not widely utilized, petitioner handled and drove the horses which *36 were used to pull cart loads of rock at quarry sites. Prior to July 1955, petitioner had, on occasion, ridden horses for pleasure. However, he suffered two serious heart attacks at that time, and upon the advice of his doctor, he has not ridden since. During the period 1957 to 1961, petitioner purchased the following six horses, used primarily for pleasure by his daughters: Name of Tupe
Date
Vendor
Price
Disposi-
Horse
Acquired
tion
Dina
Pleasure
Horse
Spring
1957
John Glick
$ 150.00
Gift to
George
Miller
1957
Flaxie Sis
Quarter Horse -
Mare
1957
600.00
Sold - April 1962
Montague
Quarter
Horse -
Stallion
1958 Karsos
1,500.00
Sold - Palamino
Fall 1061
Unnamed
Appaloosa-
Stallion
4-18-57
Frank
Groff
540.15
Sold - April 1962
Unnamed
Appaloosa-
Mare
6-5-61
Public
Sale
962.00
Sold -
April 1962
Dixie
Tennessee
Walking
Horse
1959 Herman
Shore
250.00
Died 1959
in auto-
mobile
accident 1614 At the time he purchased the quarter horses and the appaloosas, petitioner was considering breeding them. However, he concluded that there was no market for such horses in Lancaster County, Pa., and so he decided not to do so. *37 He disposed of the last of these horses at a public auction in April 1962. Petitioner first became interested in American saddle bred horses (sometimes referred to as saddle horses) sometime in 1961. O. Wendell Jones, Sr., now deceased, (hereinafter referred to as Jones) was an American saddle bred horse trainer, originally from Kentucky, who operated a stable in York County, Pa., during 1961. Jones had an excellent reputation at that time as a trainer of, and person knowledgeable with regard to, American saddle bred horses. In fact, he was generally considered one of the top men in this field in the eastern part of the United States. Petitioner had become acquainted with Jones sometime prior to that year. At various times during 1961, petitioner discussed at length with Jones his interest in American saddle bred horses, and he expressed to him that he was considering investing in this type horse. Jones advised him that a considerable amount of money could be made from the breeding, raising and sale of saddle horses. Petitioner's daughter, Ruth Louise, was present at some of these discussions and remembered conversations with respect to her father's starting a breeding operation *38 of saddle horses. On August 14, 1961, upon the advice of Jones, petitioner purchased for $1,248 his first show horse, a standardbred brood mare named Silkness. Shortly thereafter, on September 5, 1961, petitioner purchased for $3,500 another show horse, this time a saddle bred gelding named Royal Mantle. Both horses were boarded at Jones' stable in York, Pa. Ruth Louise, petitioner's daughter, rode Royal Mantle in various horse shows. She also showed Silkness a few times, but Jones, who was hired by petitioner to train and prepare Royal Mantle for show purposes, also rode Silkness in shows. At the time of the purchase of these two horses, petitioner had not definitely decided to embark upon any saddle bred horse operation. In fact, he did not even consult his wife, Ruth, with respect to his purchase of Silkness because he was aware that she did not like horses and did not approve of shows on Sundays due to religious convictions. Furthermore, one of her most serious objections to her husband's purchase of saddle horses was that he had suffered two heart attacks and she did not want him to become involved in breeding and raising horses since it would be an added burden to him. *39 Despite Ruth's dislike of horses, petitioner discussed with her and their daughters, in particular Ruth Louise, the possibility of undertaking horse breeding activities. Petitioner had considered breeding standardbreds or road horses, rather than saddle horses, but Ruth Louise advised him that there was a better market for saddle bred horses. In addition to discussions with his family and Jones, petitioner investigated further into the possibility of breeding saddle horses. In this regard, he made trips to Kentucky and other parts of the country during 1961 and 1962. Sometime in 1961, petitioner visited Castleton Farms, Lexington, Ky., a successful American saddle bred horse operation which produces saddle horses for show purposes and horses for racing purposes. Dodge Stables, a division thereof, breeds saddle horses and has been doing so for approximately 20 years. Petitioner, accompanied by Jones, spoke with the owner of the farm, Mrs. Dodge, and with Earl Teater (hereinafter Teater), the manager-trainer. He toured the farm and 1615 facilities there and discussed with Teater the feasibility of commencing a saddle bred horse operation in Lancaster County, Pa. Teater, a respected *40 and well-known trainer, felt that such an operation was advisable because he predicted an increase in the sale of saddle horses over the course of the subsequent five or ten years. During 1961 and 1962, petitioner and Jones attended the Tattersall Sales, a wellknown public auction sale for saddle horses in Lexington, Ky., held in the spring and fall of each year. These sales are attended by persons interested and occupied in the saddle horse business. Petitioner did not attend the sales for the purpose of purchasing horses, but rather to meet people interested in purchasing saddle horses and to study the types and quality of horse sold and the prices thereof. While at one of these auctions in 1961 or 1962, Jones introduced petitioner to James B. Robertson (sometimes hereinafter referred to as Robertson), a professional horse breeder, trainer, and operator of a horse farm located near Lexington, Ky. Robertson, who was then interested in buying quality saddle bred horses for certain of his clients, was under the impression at the time of their meeting that petitioner was going to start a saddle horse operation. In addition to the aforesaid trips, late in 1961 or early 1962, petitioner, *41 once again accompanied by Jones, also visited the horse farm owned and operated by George W. Gwinn (sometimes hereinafter referred to as Gwinn) in Danville, Ky. Gwinn spent a little over half a day with petitioner and Jones, showing them his farm and breeding facilities and discussing with them the prospect of petitioner's embarking upon the saddle bred horse business. Gwinn advised petitioner to be careful in the selection of horses and to buy quality stock. Stoltzfus also visited other saddle horse farms in 1961 and 1962, viz., Bill Mountjoy's farm in Lawrenceburg, Ky., and Frank and Garland Bradshaw's farm in Danville, Ky. In November 1961, petitioner, accompanied by his wife, his daughter, Ruth Louise, and Jones, visited Emerald Farms in Delaware, Ohio, where he purchased a fine harness saddle horse named Uptown. While there, petitioner spoke with E. A. Knowlton, owner of Emerald Farms, with respect to his breeding farm and he also made an extensive visual inspection of the stables and other related facilities there. On his return from Emerald Farms, Stoltzfus began to formulate plans for the construction of a stable. Preparation of final plans for the construction of a stable *42 and related breeding facilities occupied considerable time. Petitioner prepared a rough design for the facilities in November 1961, and in 1962, he directed H. M. Stauffer & Son, construction and building suppliers, to prepare final construction drawings and specifications based upon his rough design. Petitioner was desirous of acquiring Bard's Crossing Farm for the purpose of constructing his breeding facilities thereon. Bard's Crossing Farm had been used by petitioner for the raising and fattening of steers since leasing it from his mother in 1956. Neither Stoltzfus, his parents, nor any members of his family had even lived there; nor had the farm ever been used for other than business purposes. This land contains limestone deposits, but the built-up nature of the surrounding area made it a less likely place for a quarry operation. Petitioner planted the Bard's Crossing pastureland with Kentucky "blue grass," which thrives in limestone soil and is reputed to be good for raising horses and other livestock. Petitioner discussed the proposed acquisition of this land with his mother, and on October 20, 1962, she made a gift of Bard's Crossing Farm to him. Thereafter, late in *43 1962, construction was commenced. In the spring of 1963, the stable and other related buildings were completed at a cost of $90,922.84. There was no opening celebration upon completion of the stable at Bard's Crossing Farm in April 1963. The horses owned by petitioner or MAS were moved there shortly thereafter. Shortly before the new stable was opened, a name was adopted for the saddle horse venture, viz., Greystone Manor Stables, division of M. A. Stoltzfus, Inc. The aforesaid horse stable and related facilities were leased by Stoltzfus to MAS at an annual rental of $12,000 during the taxable years ended October 31, 1963, and October 31, 1964, [2] respectively. As finally constructed, the stable is a long, narrow building, two stories high. 1616 The first floor has a long corridor through the center of the building with stalls on each side of the corridor. A large portion of the second floor is used as a hay loft to store *44 straw and hay; the smaller portion thereof is a lounge. Attached to one end of the stable is another large building, which is the indoor working arena. Petitioner incorporated a number of laborsaving devices into his plan of the stable. Each stall has a small opening from the second floor hay loft, which is a hay chute, through which straw is dropped directly into each stall. There is also a conveyor system underneath the stables for use in cleaning them. The refuse is dropped through an opening in each stall to the conveyor belt and is thereby transported to the back of the building. The lounge on the second floor of the stable has a large picture window overlooking an outside work ring, located immediately behind it. The lounge was designed for the convenience of prospective purchasers and their wives so that they may step inside to use the rest room or to warm themselves while still being able to watch the horses being worked in the ring. The lounge is also used by the manager as an office and as a place for filing records. With the exception of two occasions upon each of which petitioner gave a dinner for Cardiacs Unlimited, a club composed of men who have suffered heart *45 attacks and of which petitioner is a member, the lounge has not been used by him or any member of his family for pleasure or any social events. The lower level of the stable also has a trophy room, which is shown to prospective customers, and a washroom, which is used to wash the horses' blankets and bandages. In view of the fact that saddle horses must be worked regularly on a daily basis, an indoor arena was constructed in which the horses may be worked if weather conditions do not permit use of the outdoor work arena. In addition to the above features, petitioner had a pond built near the stable and other related buildings for fire protection. In 1962, one of the existing barns on Bard's Crossing Farm was converted by petitioner into a brood mare barn. However, as of the time of the trial herein, there had been no substantial changes to the farm since completion of the main stable in 1963 and the conversion of existing buildings to accommodate the horse operation. A few trees have been planted since then and an existing corn barn was converted into a breeding barn for the sake of privacy. Prior to the conversion of the corn barn, breeding took place behind the brood mare *46 barn. The exact date of this conversion is uncertain, but it appears to have occurred sometime shortly after the last of the years at issue. It was after his visit to Emerald Farms in November 1961, that petitioner decided he wanted to acquire American saddle bred horses and undertake a saddle horse operation. In pursuance of this desire, Stoltzfus instructed Jones to procure for him a good blood line of brood mares for breeding purposes. On March 5, 1962, Jones succeeded in acquiring for petitioner for $400 a brood mare with good blood lines named Sensation's Last Love. This horse was purchased at such a low price because she was crippled and could no longer be shown. Sensation's Last Love was brought to the Jones stable in York immediately after she was purchased because petitioner at that time did not have a stable. Several days thereafter, she was sent to Robin Hill Farm in New Jersey to be bred. Sensation's Last Love died while delivering a colt on May 14, 1964. Insurance proceeds of $3,000 were received on account of the death of this mare by MAS, which had insured her. Stoltzfus no longer saw a need to retain his quarter and appaloosa horses and on April 9, 1962, [3] a *47 dispersal sale of them was held. In the same month, Jones [4] was employed on a full-time basis as manager of petitioner's saddle horse operation and as a trainer. The basis of Jones' compensation was salary plus a 10 percent commission on horses sold. Even prior to April 1962, Jones received a commission for selling horses for Stoltzfus. As part of his duties, Jones was also instructed by petitioner to look for quality 1617 untrained saddle horses which could be trained and developed for sale. Jones advised petitioner to purchase a good stake horse, that is, a top finished [5] show horse which could compete for the top stake prizes at major horse shows. *48 In addition to Sensation's Last Love, petitioner purchased the following horses during 1962: Name
Date
Type Cost
Disposi-
Date of
Proceeds
Acquired
tion
Disposi-
tion
Choice
4-6-62
Untrain-
ed
$ 8,000
On Hand
--
--
Command-
er
Gelding
[6]
New Look
4-6-62
Untrain-
ed
3,500
Sold
2-5-65
$ 25,000
Gelding
Shining
4-6-62
Untrain-
ed
3,500
Sold
May 1964
575 Command-
er
Gelding
Lady Viola
6-2-62
Brood
Mare
1,200
Sold
Oct. 1964
300 Petitioner decided to have MAS conduct the saddle horse activities. The exact date is not clear, but it appears that Stoltzfus made this decision sometime during the last seven months of 1962. His decision was based upon his concern over his heart condition and his desire to have *49 the saddle horse operation continue in the event of his death. Stoltzfus consulted the accounting firm of Hatter, Harris and Beittel of Lancaster, Pa., as to the manner of effectuating the transfer. The accountants advised petitioner to make January 1, 1963, the effective date of the transfer of the assets relating to the saddle horse operation to MAS. The following journal entries were made on the books of petitioner-corporation as of January 1, 1963, to reflect the transfer of the following assets at cost basis from the individual petitioner to MAS: Account
Asset
Cost Basis
Number
28
Machinery and Equipment
$ 1,923.22
29
Autos and Trucks
11,451.44
30
Horses
39,348.00
28R
Reserve for Deprecia-
tion Macinary and Equipment
$ 441.48
29R
Reserve for Deprecia-
tion Autos and Trucks
2,290.29
30R
Reserve for Deprecia-
tion Horses
4,242.20
Morris A. Stoltzfus
[7]
45,748.69
To record horses, van
and equipment trans-
ferred to corporation
by Morris A. Stoltzfus
No notes or other evidence of indebtedness with respect to this transfer of assets were presented at trial. Although the effective *50 date of the transfer was recorded as January 1, 1963, the journal entry itself was not made by the accountants until some time subsequent to that date, apparently in May or June 1963. Proper books of account were at all times maintained by petitioner-corporation with respect to the horse operation. Subsequent to his decision in 1962 to transfer the saddle horse venture to petitioner-corporation, petitioner did not purchase any saddle horses for his own personal account. However, MAS, the corporate petitioner, did purchase and owned the following saddle horses during 1962: 1618 Date of
Date
Dispo-
Dispo-
Name
Acquired
Type
Cost
sition
sition
Proceeds
Hayfield
Conquer-
or
7-18-62
Finished
$ 25,000
Sold
Oct.
$ 2,200
1964
Chief
Grey-
stone
7-27-62
Stud
Colt
3,500
On Hand
Lady
Esther
[8]
8-20-62
Stand-
ardbred
Brood
400
Sold
7-31-65
[9] 500
(Madela-
tion)
Mare
Belle of
Grand-
view
11-2-62
Brood
Mare
7,500
Died
7-30-64
6,000
Prince
of Knight
12-8-62
Unfinis-
hed Gelding
2,500
Sold
10-31-66
4,000
*51 Hayfield's Conqueror was the only finished horse purchased by Stoltzfus or MAS during 1962. The management of MAS did not wish to purchase finished horses, but agreed to do so because of Jones who insisted that it was necessary to acquire a stake horse, that is, a finished gaited horse to compete in top stakes at major horse shows. At the time of the purchase of Hayfield's Conqueror in July 1962, Stoltzfus also owned another finished gaited horse named Royal Mantle. However, Jones did not consider this horse good enough for stake competition, and MAS agreed to acquire Hayfield's Conqueror in order to placate Jones. Chief of Greystone (hereinafter sometimes referred to as Chief) was three weeks old when purchased by MAS from Castleton Farms. The colt was selected by petitioner who was impressed by the physical characteristics and blood lines of the stud colt. Chief was sired out of Carol Trigg by Wing Commander, a horse reputed to be the "Nation's Sire" at that time. Because Wing Commander sired Chief at the age of 22, petitioner realized that he would not sire many more colts and this contributed to his decision to buy Chief, who could be used for stud purposes by MAS. Before retiring *52 Wing Commander from servicing outside mares, Castleton Farms charged $1,000 per stud service for him. [10]
Chief was acquired by MAS to be trained and developed into a superior show horse. It was anticipated that once he obtained a reputation for himself and for Greystone Manor Stables, division of MAS, Chief could then be used for breeding purposes. Following the purchase of Chief, he was boarded at Dodge Stables until the spring of 1963, at which time the stable at Bard's Crossing Farm was completed. During this period, Castleton Farms attempted to repurchase Chief for triple his purchase price. The management of petitioner-corporation, in particular petitioner, did not want to show Chief but preferred to start breeding him at the earliest possible time. Due to the urging of Charles E. Crabtree, Jr. (hereinafter referred to as Crabtree), who took over as manage-trainer of the saddle horse operation on March 1, 1965, the management of MAS agreed to allow Chief to be shown and thereby establish his value. However, from the time of Chief's purchase, the management of MAS intended *53 to use him for breeding purposes. Stoltzfus had wanted Crabtree to breed mares to Chief when he was first being shown, but this was not feasible because very few horses can perform stud services and be shown at the same time. Chief developed into a superior show horse, due primarily to the efforts of Crabtree. During his short career as a show horse, Chief won three "World Championships." [11] Winning the "World Championship" increases a horse's value more than winning at any other show. Chief won 15 other major show prizes during the years 1964 through 1967. Chief's reputation as a champion had been sufficiently established and he was removed from show competition following the 1967 show season so that he could be utilized for breeding purposes. When removed from competition, Chief was five years old, a comparatively young age to remove a horse from show competition. However, his 1619 temperament was such that he could not be trained for show purposes and used for stud service simultaneously. When he was retired from the show ring, Chief had not realized his full potential *54 as a show horse. If he had not been retired, there was no reason not to expect continued success from him in horse shows. Since the 1967 season, Chief of Greystone has been used for stud services only. At the time of the trial herein, the stud charge was $400 per service. This is a relatively low price, but was set in order to encourage owners of outside mares to use Chief and thereby get his colts in the market. During 1968, MAS bred 20 of its own brood mares to Chief and 30 outside mares. It would have taken a number of years to draw that many outside mares had Chief never established his reputation in shows. As Chief's colts are proven to be good horses, the fee for his stud service will be increased. Eighty stud services per year is considered to be average for a saddle horse stallion. At the time of the trial herein, Chief was acknowledged to be the best son of Wing Commander. In fact, he defeated in show competition the horse which Castelton Farms, owner of Wing Commander, selected to replace Wing Commander. The fact that Castleton Farms no longer breeds outside mares to Wing Commander enhances the value of Chief since it is up to his sons to sire champion colts. Petitioner-corporation *55 has received several offers to purchase Chief, one of which was for $85,000. MAS did not accept any offers since it was felt that Chief was more valuable providing stud services. As of December 31, 1968, Crabtree placed a valuation of $100,000 on Chief of Greystone. George Gwinn of Danville, Ky., has been engaged in breeding, developing, buying, and selling horses since 1924. This is his sole source of income. His business is known as Gwinn Island Stock Farm, which consists of 400 acres with approximately 200 head of horses, including brood mares, colts, and horses in training. At the time of the trial, Gwinn was a member of the American Saddle Horse Breeders' Association and the American Horse Show Association. He was at that time a senior recognized judge in the American Horse Show Association and has judged horse shows throughout the country, including the "World Championship" at the Kentucky State Fair in Louisville, Ky., and the Junior League Horse Show of Lexington, Ky., which is the largest outdoor horse show in the American Horse Show Association. Gwinn has sold horses to almost everyone in the saddle horse business. In Gwinn's opinion, Chief of Greystone was undervalued *56 by Crabtree. Gwinn estimated his value at $125,000 to $150,000, and further stated that it would be a mistake for MAS to sell Chief because he is very valuable to its saddle horse breeding operation. James B. Robertson is a professional horse man who managed several saddle horse operations prior to starting his own stable in approximately 1954, which is called the Jim B. Robertson Farm and the Winganeek Farm. He is a member of the American Saddle Horse Breeders' Association and the American Horse Show Association. His sole source of income is the saddle horse business and his principal source of income in that field is from the sale of horses. Robertson estimated that Chief could earn approximately $15,000 per year in stud fees and $250,000 over a fiveyear period starting in 1969 from the sale of his colts. In addition to the aforementioned horses purchased by petitioner or by MAS during 1961 and 1962, the following additional saddle horses were acquired and owned by MAS during 1963: 1620 Name
Date
Type
Cost
Disposi-
Date of
Proceeds
Acquired
tion
Disposi-
tion
Lady
4-9-63
Brood
Talmage
Mare
$ 15,000
On hand
Wings
4-19-63
Brood
Mare
8,000
On hand
Delight
Vain Model
4-19-63
Brood
Mare
8,000
On hand
Knights
4-19-63
Unfinis-
hed
4,000
Died
Insured
Oct. 1965
$ 2,500
Crusader
Gelding
Grey-
stone's
7-19-63
Unfinis-
hed
2,000
On hand
Admira-
tion
Filly [12]
Sunshine
7-19-63
Brood
Mare
2,500
On hand
Genius
Lady
Clear
8-1-63
Stud
5,000
Sold
7-3-68
28,500
Command
Dream
9-3-63
Brood
Mare 10,000
Sold
7-19-66
12,500
Sequence
Bit O
Choice
9-30-63
Brood
Mare
3,500
Sold
2.27-68
200
Anacoho
11-14-63
Finished
14,500
Sold
1968
22,500
Chief-
tain
*57 The first four horses listed on the above chart were purchased while Stoltzfus was visiting the Tattersall Sales. At this auction, he became acquainted with certain horse owners and it was from these men that the horses were purchased. Stoltzfus had not intended to buy any horses while on this trip to the Tattersall Sales, and consequently did not bring with him any checks of MAS. However, when the opportunity presented itself to purchase these four horses, he used his own personal checks to cover the purchase price. However, Stoltzfus intended to buy the horses for petitioner-corporation, and upon his return from Kentucky, he transferred these horses to MAS and instructed the bookkeepers of MAS to record said horses on the corporation books and to set up an account payable to him for the money he expended therefor. No notes or other evidence of indebtedness with respect thereto were introduced at trial. During 1963, Stoltzfus personally expended certain sums for certain show horse expenses. These expenditures which were recorded on the books of MAS as expenses of that corporation were: Nature of Expense
Amount
Breeding
$ 166.00
Utilities
61.21 Show Expenses
566.14 Feed and Straw
559.03 Boarding
1,875.00
Veterinary
150.50 Stable Supplies
1,198.17
Advertising
122.02 Groom
153.00 Total
$ 4,851.07
*58 The following journal entries were made on the books of petitioner-corporation during the year ended October 31, 1963, in order to reflect expenditures made by Stoltzfus for the purchase of the four aforesaid horses and these other show horse expenses: Number
Account
30
Horses purchased
$ 35,000
106
Horse expense
4,851.07
11
Morris A. Stoltzfus
[13] $ 39,851.07
To reflect expeditures
by Morris A. Stoltzfus
During 1964, the following saddle horses were purchased and owned by MAS: 1621 Name
Date
Type
Cost
Disposi-
Date of
Proceeds
Acquired
tion
Disposi-
tion
Ensign's
9-19-64
Brood
Mare
$ 750
Died
Insured
8-8-68
$ 2,500
Heavenly
Glory
Wilma
Stone-
wall
7-13-64
Brood
Mare
3,500
On Hand
Mount joy's
Top
Talent
7-13-64
Mare
3,500
Sold
8-30-68
12,500
Major's
Princess
7-13-64
Brood
Mare
[14]
On Hand
[14]
*59 In addition to the horses purchased during the years at issue, MAS has acquired approximately 43 saddle horses over the period from November 1, 1964, to June 1968, at a cost of approximately $215,000. As of May 1968, MAS had the following saddle horses on hand: 30 brood mares; 8 studs, 5 of which were in breeding; 4 geldings in training; 6 two-year-old mares in training; and 9 yearlings. The breeding activities during the years at issue produced the following six foals: Year of
Name
Dam
Disposition
Birth [15]
1963
King Anders
Silkness
Sold
1964
Bard of Cornwall
Sensation's Last
Love
Sold
Limestone Major
Major's Princess
Sold
Unnamed
Lady Ester
(Medelation)
Sold
1965
General Harper
Ensign's Heaven-
ly Glory
Sold
Unnamed (Stallion)
Wilma Stonewall
Sold
The saddle horse breeding operations of MAS have produced approximately 61 foals in the years 1965 through 1968. All of the 1968 foals were on hand in January 1969; 27 of the foals produced from breeding activities subsequent to the years at issue were sold or traded primarily for brood mares. All cash proceeds from the sale of the *60 foals were paid to petitioner-corporation, and in instances where they were traded for brood mares, MAS acquired title to these mares. Moreover, death benefits, which were payable under the mortality horse insurance policies taken out by MAS on October 8, 1963, and October 8, 1964, on all the horses on hand on those dates, were paid to petitioner-corporation. In particular, insurance proceeds were received by MAS on the death of Sensation's Last Love, one of the horses originally purchased by Stoltzfus and transferred to MAS as of January 1, 1963. Petitioner-corporation continued to insure the horses it owned subsequent to the years involved herein. During the years 1961 to 1964, inclusive, accountants prepared and filed Pennsylvania state tax returns for MAS, as a result of which filing petitioner-corporation paid capital stock tax, which is in effect a property tax, upon saddle horses transferred to it by Stoltzfus and those otherwise acquired by it. By way of background to the saddle horse industry, the American Saddle Horse Breeders' Association referred to previously is a registry association for American bred saddle horses. It is a stock company, its stockholders consisting *61 of horse owners and breeders. Its purposes are to maintain breeding records, register transfers, and register offspring of saddle horses in order to have and keep records of blood lines. This association is not a governmental agency and is not in any way connected with any state or local government. Its objective is not to record ownership of horses, but to maintain records of the pedigrees. Whenever there is a transfer of a saddle horse registered with this organization, the seller or transferor marks the transfer on the back of the certificate of registration and then sends the certificate to the association's office, which records the transfer and sends the certificate to the 1622 buyer or transferee. Errors in registration of owners' names are common, and this is particularly true where the owner is a corporation with a name similar to the name of the individual managing the corporation. All, except nine, of the horses purchased by petitioner-corporation during the years at issue were properly registered with this association, and the certificates indicated MAS as owner. One of these nine, Hayfield's Conqueror, was registered to H. G. Whittenberg, the owner prior to MAS. *62 Debbie Denmark was registered to Greystone Manor Farms, while the remaining seven were registered in the name of Morris A. Stoltzfus. However, one of these seven, Lady Talmage, was registered in the name of Morris A. Stoltzfus, Inc., with another association called the American Horse Show Association. Since, on all horse purchases by MAS, the sellers were instructed to register the horses to Greystone Manor Stables, division of Morris A. Stoltzfus, Inc., these improper registrations were erroneous. Moreover, it is not customary in the saddle horse industry to treat American Saddle Horse Breeders' Association registration certificates as title certificates. In fact, with respect to nonbreeding stock, viz., geldings, it is not unusual to transfer them without delivery of registration certificates. There is a large market for American saddle bred horses in the United States, and the majority of persons who purchase such horses acquire them for show purposes. Those who invest in saddle bred horses for pleasure or as a hobby generally buy horses that are already trained, finished, and ready for show. It is possible to develop a profitable business venture from raising, breeding, and *63 selling American saddle bred horses. In fact, there are many large, profitable saddle horse businesses as well as many individual transactions in saddle horses which result in substantial profit to sellers. It is not unusual to experience losses during the formative years of a saddle horse business. It is estimated to take approximately five to ten years to develop a financially successful saddle horse breeding business. Several years of development are required in order to build a reputation and to produce and develop stock for sale. Colts must not only be produced, but must be started in training in order to show their potential, before it is profitable to sell them. However, once a saddle horse business becomes well established and establishes the reputation of its breeding stock and colts, it will be able to sell profitable yearling colts without any training. George Gwinn, James B. Robertson, and Charles E. Crabtree are all experienced in the saddle horse business and are in substantial agreement as to the appropriate steps that an investor should take in order to start and build a profitable saddle horse business. The following steps were suggested: (a) The investor should *64 employ the services of a person knowledgeable about saddle horses and with a good reputation in the industry for the training and handling of saddle horses. (b) The investor should provide adequate facilities, including a stable to house the horses, indoor and outdoor exercise areas for training and showing horses to customers, and pasture land for grazing. There should also be separate barn or stable facilities for housing the operation's brood mares. (c) The investor should acquire the highest quality stock available of the following types: (1) quality breeding stock (studs and brood mares) with good blood lines and a record of success in show competition; (2) quality young unfinished horses to train, show and sell; and (3) some finished horses to show for the purpose of putting the business' name before the saddle horse purchasing public and to establish the business' reputation. Geldings are the preferred type in the industry for the latter two categories, since they are the easiest and most popular type of saddle horse to train, show and sell. It is considered very important for an investor to show horses competitively in order to develop a financially successful saddle *65 horse business. Gwinn, Robertson, and Crabtree are all acquainted with most of the saddle horses purchased by petitioner and MAS during the years at issue, and they agree that they consisted of quality stock of the types necessary to develop a financially successful saddle horse business. The quality of the stock is apparent because the saddle horses have earned prizes at horse shows throughout the country. Despite the quality horses which were available during the years in question, improper handling and mismanagement of the horses led to a series of unfortunate occurrences 1623 and hampered the development of the horse operation. The gelding Uptown was shown for approximately two years, when the horse was foundered by improper handling. Attempts to rehabilitate the horse failed and in 1966, Uptown was donated to the University of Pennsylvania Hospital. Sensation's Last Love was the first mare acquired by Morris A. Stoltzfus. She died on May 14, 1964, while having a colt. Insurance proceeds of $3,000 were received by MAS which had insured her. The gelding Shining Commander was untrainable, and was sold in 1964. After repeated unsuccessful attempts to breed Lady Viola, *66 the horse was sold as barren. Hayfield's Conqueror foundered during a horse show in 1962, as a result of poor handling and was finally sold. The mare Belle of Grandview died July 30, 1964, while carrying a colt. Insurance proceeds were paid to MAS upon the death of this horse. The gelding, Prince of Knight, was traded for two mares with an aggregate value of $4,000. The mare Wings Delight foundered as a result of improper handling at a horse show in 1963. The horse has been retained as a brood mare. The gelding Knights Crusader developed into a good show horse, but died suddenly in October 1965. Insurance proceeds were received by MAS on account of its death. The mare Dream Sequence broke down and was unable to take part in horse shows as a result of being driven too hard. Therefore, she was sold. The mare Bit O Choice could not carry colts and aborted each time. She was sold in 1968. Because of the aforementioned misfortunes, Stoltzfus became dissatisfied during 1963 with Jones as manager and trainer of the horse operation. Jones' drinking habits interfered with his work, and several injuries to horses were attributable thereto. Jones was given a leave of absence in *67 1963, but, upon his return, it became evident that his performance was unsatisfactory and he was dismissed from his position in December 1963. One of Jones' sons, Wendell C. Jones was then retained as manager-trainer, but his work was also unsatisfactory, and this led to his dismissal in December 1964. During 1964, the general condition of the saddle horses on hand deteriorated due to Wendell C. Jones' mismanagement. Stoltzfus was also dissatisfied with the work of Jones and his son because they did not properly implement a breeding program. They had represented to petitioner that they were knowledgeable in breeding saddle horses, but Stoltzfus finally discerned that neither one was knowledgeable in crossbreeding procedures. Charles E. Crabtree was first contacted in 1963 by R. H. Brown, an emissary for Stoltzfus who wanted to ascertain whether Crabtree was interested in working for Greystone Manor Stables. Crabtree declined the offer. Crabtree was again contacted shortly after Christmas in 1964 as to the possibility of working for MAS as managertrainer of the horse activities. During these discussions, Crabtree attempted to ascertain whether petitioner was interested in saddle *68 horses for pleasure or just as a "passing fancy." Having become convinced that Stoltzfus was interested in saddle horses as a business, Crabtree accepted the offer. As of March 1, 1965, the date he began to work for MAS, Crabtree found the saddle horses to be in a "sorry condition," and he could not recommend any of them as to their soundness. They were whip-shy and in a state of frenzy. Approximately eight of them were foundered at that time. However, since Crabtree became manager, only one horse out of approximately 100 horses that he has handled for petitioner-corporation has become foundered. There were very favorable results from the other horses purchased during the years at issue. Choice Commander, who developed slowly, was not gaited [16] until Crabtree became manager of the MAS saddle horse operation. He was up for sale at the time of the trial and was valued by the management of petitioner-corporation at $25,000. New Look was trained, gaited and shown, and finally sold in 1965 for $25,000 by MAS. Silkness, a standardbred mare, was bred in 1962 and delivered a foal, King *69 Anders in 1963, which was subsequently sold. Lady Esther, also a standardbred mare, was bred in 1963 and delivered a foal in 1624 1964. However, management of MAS determined not to raise and train standardbreds in addition to saddle horses because there was not enough of a market for them to justify the additional costs involved. Therefore, she was sold, along with two standardbred colts in 1965. Lady Talmadge was acquired to be shown and used for breeding. She was bred in 1965 and delivered a foal in 1966. The foal died a short time thereafter. Lady Talmadge was being used by MAS as a brood mare at the time of the trial. Wing's Delight and Vain Model were also acquired for show and to be used as brood mares. They were both being used by MAS for breeding as of January 1969. Greystone's Admiration, a filly, was acquired to be trained, shown, and then used as a brood mare. She was bred in 1966 and delivered a foal in 1967. She was still being used for breeding at the time of the trial. Sunshine Genius Lady was purchased as a brood mare. She was bred and has produced two foals for M. A. Stoltzfus, Inc. At the time of the trial, she was on hand and was being used as a brood *70 mare by the corporation. Clear Command was purchased as a stud for the corporation. He was sold by MAS for $28,500. Ensign's Heavenly Glory was purchased in 1964 and was immediately bred and produced a foal in 1965. The mare produced two more foals for the corporation, one in 1966 and another in 1967. All three foals were sold by the corporation. Ensign's Heavenly Glory died in 1968, being insured by MAS, which received $2,500 in insurance proceeds. Wilma Stonewall was purchased in 1964 and was immediately bred and produced a foal in 1965. She has produced foals in 1966, 1967 and 1968. She was on hand and was being used as brood mare by the corporation as of January 1969. Three of her foals have been sold; her 1967 foal, My King's Stonewall, was on hand as of January 1969 and was valued at $1,000. Mountjoy's Top Talent, a mare, was purchased in 1964 for show and sale or use as a brood mare. This horse developed and was sold by petitioner-corporation for $12,500, a gross profit of $9,000. Major's Princess, a mare, was carrying a foal when acquired and delivered the foal in 1964. The foal was sold for $750 in 1967. She has produced foals in 1966 and 1968. Her 1966 foal, Bird *71 in Hand, was on hand at the time of the trial and was valued at $8,500. Major's Princess was also on hand then and was being used by MAS as a brood mare. Stoltzfus and his wife do not participate in any of the social events connected with horse shows. They do not entertain at horse show events and are generally not socially active. As of January 1969, MAS had 72 saddle horses on hand, including foals, with a cost basis of $207,481. In Crabtree's opinion, the total market value of these horses was $545,500. Gwinn and Robertson both feel that this valuation was reasonable, and that, if anything, it was too low. The foregoing recounted the nature and extent of the saddle horse operations of petitioner and MAS. The following deals with the deficiencies asserted and the grounds therefor. During the years at issue, petitioners reported taxable income and income tax liabilities on their respective returns in the following amounts: Docket No. 3827-67 (Petitioner)
Taxable
Tax Year
Income (Loss)
Liability
1961
$43,912.37
$16,658.27
1962
44,208.45
16,503.48
1963
70,828.50
32,444.88
Docket No. 3828-67 (Petitioner-corporation) FY
Taxable
Tax Ended
Income (Loss)
Liability
10-31-61
$12,231.08
[17] $3,669.32
10-31-62
828.65
[17] 248.60
10-31-63
20,192.72
[18] 0
10-31-64
(58,630.90)
0
*72 In a statement attached to the notice of deficiency mailed to Morris A. Stoltzfus and Ruth E. Stoltzfus, respondent advised petitioners, in part, as follows: During taxable years ended December 31, 1961, December 31, 1962 and 1625 December 31, 1963, M. A. Stoltzfus, Inc., of which you are the controlling shareholders, purchased assets for your personal benefit and pleasure. These assets were for use in the show horse activity. Some of these assets were registered in your names. Others, though apparently registered in the name of M. A. Stoltzfus, Inc. were acquired for your personal benefit and pleasure. Accordingly the purchase price of these assets represent ordinary income to you under section 61(a) of the Internal Revenue Code of 1954. In addition to the foregoing, M. A. Stoltzfus, Inc. also incurred certain alleged expenses in connection with the show horse activity. *73 These expenses were also incurred for your personal benefit and pleasure. Accordingly the excess of the expenses incurred by M. A. Stoltzfus, Inc. over income received by M. A. Stoltzfus, Inc. relative to the show horse activity is ordinary income to you under section 61 of the internal revenue code of 1954. The income as computed is limited to the excess of cash expenditures (to the extent not deductible by you) over income received by M. A. Stoltzfus, Inc. The computation of additional income to you as a result of payments by M. A. Stoltzfus, Inc. in taxable years ended December 31, 1961, December 31, 1962 and December 31, 1963 is summarized as follows: Taxable Year Ended Dec. 31
1961
1962
1963
Excess of cash and non-cash show horse expenses of M.A.
Stoltzfus, Inc.
over show horse
expense [sic] [19]
$ 90
$ 6,394.40
$ 89,919.50
Less: Non-cash
items and other
adjustments
Depreciation
(90) (4,083.44)
(12,546.08) Rent
[1] (7,000.00)
Interests
(429.17) [2] (1,540.06)
Total non-cash
items and Adjustments
$ 0
$ 1,881.79
$ 68,833.36
Add: Assets
purchased by M.S. Stoltzfus, Inc. for you or
your benefit
Horse Cart and
Harness
600 Tack Room Improvements
1,512.00 Horses
38,900.00 37,500.00 $ 600
$ 40,781.79
$ 107,845.36
*74 For taxable years ended December 31, 1961 and December 31, 1962 you claimed deductions for show losses incurred in your show horse activities in the respective amounts of $4,951.86 and $21,518.86. These claimed deductions representing the excess of claimed expenses over income derived from your show horse activities are reflected on schedule F. Form 1040, for the taxable years ended December 31, 1961 and December 31, 1962. It has been determined that your show horse activity was undertaken for your personal pleasure and gratification. As such it does not constitute a business undertaking for profit * * *. Accordingly, the claimed deductions have been disallowed to the extent that the claimed expenses exceed income. The following tabulations set forth the items in dispute: 1961
1962
Income
Prizes
$ 490.00
$ 2,838.08
Breeding Feed
40.00 Total income
$ 490.00
$ 2,878.08
Expenses
Feed
$ 85.26 Horse expenses
2,067.51
Horse show expenses
488.47 $ 313.19
License - Horse Trailer
30.00 Depreciation - Horses
1,251.42
3,104.80
- Machinery & equipment
2,488.77
Blacksmith
370.15 Horse training
8,352.22 Entry fees
3,594.37
Supplies
619.20 Insurance
900.00 Feed, supplies, insurance, etc
6,173.44 Total expenses
$ 5,441.86
$ 24,396.94
Net Loss on Horses
$ 4,951.86
$ 21,518.86
*75 In 1962 you listed on schedule F. Form 1040, new equipment having a cost basis of $2,033.45 and $11,451.44. In connection therewith, you claimed an investment credit of $373.12. It has been determined that the property having a cost basis of $11,451.44 was acquired for use in the show horse activity. It has also been determined that of the property having a cost basis of $2,033.45, the sum of $1,288.45 represents property acquired for use in the show horse activity. The balance of such property having a cost basis of $745.00 (hay crimper) was used in the farming activity. Since the property acquired for use in the show horse activity does not constitute business assets the investment credit is limited to the amount shown. With respect to the year 1963 the investment credit of $320.54 as claimed was based on furniture and fixtures for the stable having a cost basis of $4,579.20. For reasons previously stated this does not constitute business property and the claimed credit has been disallowed in full. * * * Taxable Year Ended December 31, 1961 Adjustments to Taxable Income
Taxable income as disclosed by return
$ 43,912.37
Unallowable deductions
and additional income:
(a) Show horse activity
$ 600.00
(b) Other income
1,603.95
(c) Schedule "F"
4,951.86
(d) Ordinary Income
751.25 7,907.06 Total
$ 51,819.43
Nontaxable income and additional deductions
(e) Gain and losses
from sales of property
375.63 Taxable income corr-
ected
*76 1627 Explanation of Adjustments
[1961]
(a) and (c) As explained in preliminary statement.
(b) It is determined that the amounts as shown below are includable in income:
(1) Payment of personal expenses
determined in previous examination
of D.M. Stolzfus & Sons, Inc. for
taxable year ended 1961
$ 751.11
(2) Payment of personal expenses determined in previous examination
of Pa. Aggregates, Inc. for taxable
year ended 1961
598.36 (3) Insurance paid on personal items by M. A. Stoltzfus, Inc. for taxable year ended 1961
254.48 Total
$ 1,603.95
(d) To include as ordinary income
the gain on sale of a tractor to D. M. Stoltzfus & Sons, Inc. a corporation owned by you.   Taxable Year Ended December 31, 1962
Adjustments to Taxable Income
Taxable income as disclosed by return
$ 44,208.45
Unallowable deductions
and additional income:
(a) Show horse activity
$ 40,781.79
(b) Other income
2,039.33 (c) Schedule "F"
21,518.86
64,339.98 Total
$ 108,548.43
Nontaxable income and
additional deductions:
(d) Gains and losses
from sales of property
999.30 Taxable income corrected
$ 107,549.13 * * * Explanation of Adjustments
[1962]
(a) and (c) As explained in prelimin-
ary statement.
(b) It is determined
that the amounts as shown below are includible in income:
(1) Payment of personal
expenses (meals) as
determined in previous
$ 699.99
examination of D. M.
Stoltzfus & Sons, Inc.
for taxable year ended
1962
(2) Payment of personal
expenses as determined
in previous
$ 249.66
examination of Pa.
Aggregates, Inc. for
taxable year ended 1962 Meals
Diplomat Motel
680.93 Taft Hotel
408.75 1,339.34 Total
$ 2,039.33
*77 * * * 1628
Taxable Year Ended December 31, 1963
Adjustments to Taxable Income
Taxable income as disclosed by return
$ 70,828.50
Unallowable deductions
and additional income:
(a) Show horse activity
$ 107,845.36
(b) Other income
1,792.09 (c) Schedule "F"
2,307.65 111,945.10
Taxable income
corrected
$ 182,773.60
Explanatin of Adjustments
[1963]
(a) As explained in preliminary
statement.
(b) It is determined that the amounts as shown below are includible in income:
(1) Payment of personal expenses as
determined in previous examination
of D. M. Stoltzfus & Sons, Inc. for
$ 1,430.01
taxable year ended 1963: Meals
$ 806.40 Florida trip 623.61
(2) payment of personal expenses as
determined in previous examination
of Pa. Aggregates, Inc. for taxable
362.08 year ended 1963: Meals
Total
$ 1,792.09 (c) It is determined depreciation claimed on stable and equipment rented by you to M. A. Stoltzfus, Inc. in connection with show horse activities, constitutes personal expenses and is therefore not allowable. Such items are set forth as follows: Stable
$1,818.46
Stable Equipment
63.32
Furniture andFixtures 425.87
Total $2,307.65
*78 1629 In a similar statement attached to the notice of deficiency mailed to MAS, respondent advised petitioner-corporation, in part, as follows: During each of the taxable years ended October 31, 1962, 1963 and 1964, you claimed deductions for certain expenditures in connection with the training and showing of horses. It has been determined that expenditures incurred in this connection as well as depreciation on assets used in training and showing horses were incurred primarily for the personal benefit of your controlling shareholders, Morris A. and Ruth E. Stoltzfus. The claimed deductions do not represent ordinary and necessary business expenses or losses from transactions entered into for profit. Accordingly, the claimed deductions have been disallowed to the extent that they exceed income from the show horse activity. The items giving rise to this disallowance are set forth in the following tabulation: Taxable Years Ended October 31
1962
1963
1964
Income
Show awards
0
$ 3,235.00
$ 4,836.33
Boarding
0
650.000
277.00 Manure
0
0
75.00 Total Income
0
$ 3,885.00
$ 5,188.33
Claimed Expenses
Interest
$ 429.17 $ 1,540.16
$ 1,870.57
Insurance
1,000.00
7,267.65 6,400.82 Horse Training
and Show
Expenses
881.79 Depreciation
4,083.44
12,546.08
14,681.79
Breeding
1,385.83 Payroll
21,531.81
28,195.57
Employment Taxes
1,359.24 1,239.13 Rent
8,588.10 12,000.00
Supplies
5,189.85 3,138.24 Stable
Maintenance
3,280.65 2,711.03 Utilities
1,044.09 2,502.61 Show Expenses
12,722.78
11,173.91
Feed and Straw
5,358.99 4,343.10 Boarding
3,730.28 1,760.00 Vet
890.40 1,264.80 Blacksmith
790.56 1,734.22 Riding Apparel
1,295.59
901.61 Stable Supplies
1,795.51 1,237.42 Trainer's Expenses
453.09 1,943.26 Transporatation
2,977.21
5,037.18 Advertising
913.32 449.15 Groom
435.00 Miscellaneous
94.14 1,160.08 Net Loss on Sale
of Horse
22,195.10 Total Expenses
$ 6,394.40
$ 93,804.50
$ 127,325.42
Net Loss Deducted
($ 6,394.40)
($ 89,919.50)
$ 122,137.09
*79 Inasmuch as the net operating loss disclosed on your return for the taxable year ended October 31, 1964 in the amount of $58,630.90 has been converted to taxable income, there exists no net operating loss deduction and the tentatively allowed overassessment are therefore recoverable. * * * 1630 Taxable Year Ended October 31, 1961 Adjustments to Taxable Income
Taxable income as disclosed by return
$ 12.23 Unallowable deductions
and additional income:
(a) Taxes
$ 35,36
(b) Insurance
$ 254.48
(c) Depreciation
90.00 379.84 Taxable income corrected
$ 12,610.92 Explanation of Adjustments (a) To allow the proper amount of Pennsylvania corporate net income tax with adjustment being computed as follows: As per state return
$ 733.86
As per income tax return
769.22 Adjustment
$ 35.36  (b) To disallow portion of premium paid to Paul G. Murray & Son to insure personal belongings of Mr. M. A. Stoltzfus. (c) For the taxable year ended October 31, 1961 you claimed a deduction of $90.00 for depreciation attributable to a cart and harness for use in showing horses. It has been determined that these assets were acquired for *80 the benefit of your controlling shareholders, Morris A. and Ruth E. Stoltzfus. Hence, this property is not a business asset subject to the allowance of a deduction for depreciation. Accordingly the claimed deduction of $90.00 has been disallowed. * * * Taxable Year Ended October 31, 1962 Adjustments to Taxable Income
Taxable income as dis-
closed by return
$ 828.65 Unallowable deductions
and additional income:
(a) Repairs
$ 4,933.27
(b) Taxes
100.00 (c) Loss incurred on
show horses
6,304.40 11,427.67 Total
$ 12,256.62
Nontaxable income and
additional deductions:
(d) Depreciation
822.13 Taxable income corrected
$ 11,434.19
Explanation of Adjustments [1962] (a) It is determined that the overhaul of aningersoll Rand Drillmaster in August 1962, constitutes a capital expenditure and is being disallowed as a repair expense. (b) To allow the proper amount of Pennsylvania capital stock tax with the adjustment being computed as follows: As per state return
$ 650.00
As per return
750.00 Adjustment
$ 100.00 (c) As explained in preliminary statement. (d) It is determined that the item capitalized in adjustment (a) *81 above had a three-year life. Double declining balance method is being used and depreciation is being allowed for 1/4 year. ($4,933.27 X 2/3 X 1/4 = $822.13). * * * 1631 Taxable Year Ended October 31, 1963 Adjustments to Taxable Income
Taxable income as disclosed by return
$ 20,192.72
Unallowable deductions
and additional income:
(a) Loss incurred on
show horses
89,919.50 Total
$ 110,112.22
Nontaxable income and
additional deductions:
(b) Depreciation
$ 2.740.90
(c) Rent Expense
96.25 2,837.15 Taxable income corrected
$ 107,275.07
Explanation of Adjustments
[1963]
(a) As explained in preliminary statement.
(b) To allow deprecia-
tion on item capital-
ized in taxable year
ended October 31, 1962
with computation being
as follows:
Cost
$ 4,933.27
Depreciation allowed in
fiscal year ended
10/31/62
822.13 Remaining basis
$ 4,111.14
Rate
.6667 Depreciation Allowable
$ 2,740.90 (c) It is determined that you are not entitled to investment credit claimed on a rented horse trailer with a fair market value of $11,000.00. Such results in an adjustment to rental expenses deduction computed as follows: Cost
$ 11,000.00
Investment Credit - 8 years or more - at 70%
$ 770.00 Rent Adjustment - 1/8 of credit
$ 96.25 *82 * * * Taxable Year Ended October 31, 1964 Adjustments to Taxable Income
Taxable income (loss)
disclosed by return
($ 58,630.90)
Unallowable deduction
and additional income:
(a) Loss incurred on
show horses
$ 122,137.09
(b) Repairs
8,350.10 (c) Taxes
250.00 130,737.19 Total
$ 72,106.29
Nontaxable income and additional deductions:
(d) Depreciation
$ 4,160.96
(e) Rental expense
96.25 4,257.21 Taxable income corrected
$ 67,749.08 1632 Explanation of Adjustments
[1964]
(a) As explained in preliminary
statement.
(b) It is determined that the over-
haul of a drill in April of 1964
constitutes a capital expenditure.
(c) To allow proper amount of Pennsylvania capital stock tax with
adjustment being computed as
follows:
As per state return
$ 400.00
As per income tax return
650.00 Adjustment
$ 250.00 The amounts deducted as expenses of petitioner-corporation and disallowed by respondent in the notice of deficiency were expended by or in behalf of MAS for the purposes and in the amounts indicated in said notice. The only issue with respect thereto is whether said amounts were expended or incurred in the pursuit *83 of a trade or business of MAS or of the individual petitioners, or whether the said amounts were expended or incurred in pursuit of a hobby by the Stoltzfus family. The amounts deducted as horse expenses of the individual petitioners and disallowed by respondent in the notice of deficiency were expended for the purposes and in the amounts indicated in said notice. The only issue with respect thereto is whether said amounts were expended or incurred in the pursuit of a trade or business of the individual petitioners, or whether the said amounts were expended or incurred in pursuit of a hobby by the Stoltzfus family. Opinion Petitioners expended certain amounts with respect to certain horse activities during the years at issue, and deducted these expenses on their respective income tax returns. Respondent disallowed any and all deductions relating to the horse activities on the ground that the expenses were not incurred in the pursuit of a trade or business of either MAS or the individual petitioners. [20] Furthermore, respondent determined that the disallowed expenses (to the extent they exceeded income) and the cost of assets purchased by petitioner-corporation relating to the *84 horse activities constituted ordinary income to the individual petitioners under section 61(a) of the Internal Revenue Code of 1954. [21] Therefore, the primary issue for our determination is whether the horse activities conducted first by Morris A. Stoltzfus and then by M. A. Stoltzfus, Inc., constituted a trade or business during the years at issue. The parties agree that our decision as to this first and main issue may be dispositive of the other issues in this case. It is well established that breeding, raising and training horses for sale may constitute a trade or business. Commissioner v. Widener, 33 F. 2d 833 (C.A. 3, 1929), affirming 8 B.T.A. 651 (1927); Wilson v. Eisner, 282 F. 38 (C.A. 2, 1922); Theodore Sabelis, 37 T.C. 1058 (1962). Nevertheless, it *85 is axiomatic that an activity may not be classified as a trade or business unless a taxpayer can prove that he had a bona fide intention or expectation of making a profit therfrom. Imbesi v. Commissioner, 361 F. 2d 640 (C.A. 3, 1966), remanding a Memorandum Opinion of this Court; Godfrey v. Commissioner, 335 F. 2d 82 (C.A. 6, 1964); Hirsch v. Commissioner, 315 F. 2d 731 (C.A. 9, 1963); American Properties, Inc., 28 T.C. 1100 (1957), affd. 262 F. 2d 150 (C.A. 9, 1958). It is not necessary, however, that the expectation be a reasonable one, as long as it is genuine. Margit Sigray Bessenyey, 45 T.C. 261 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967), certiorari denied 389 U.S. 931 (1967). Both parties recognize that the issue before the Court is essentially a question of fact. Margit Sigray Bessenyey, supra; American Properties, Inc., supra; Henry P. White, 23 T.C. 90 (1954), affd. per curiam 227 F. 2d 779 (C.A. 6, 1955). The *86 parties disagree as to the existence of certain facts and as to the weight to be accorded to others, as well as to the application of the settled legal principles in this area to the particular facts of this case. Respondent summarized his position on brief as follows: 1633 It is respondent's position and argument on this first and main issue that the show horse activities under the name of "Greystone Manor Stables" were undertaken primarily by Morris A. Stoltzfus and later by Ruth E. Stoltzfus * * * for personal pleasure and gratification and as such did not constitute a business undertaking for profit or transactions entered into for profit * * *. Petitioners, on the other hand, contend that they engaged in breeding, raising, and selling horses with the bona fide intention of making a profit therefrom. On brief, we find the following statements: In November of 1961, Petitioner Morris A. Stoltzfus made the decision to engage in the business of breeding, raising and selling American saddle bred horses, with the genuine intention to make profit therefrom. * * * In 1962, M.A. Stoltzfus, Inc. entered the horse business, ***. * * * We construe these statements as an admission *87 and concession that MAS was not engaged in any trade or business in connection with horses during its fiscal year ended October 31, 1961. Therefore, we hold that any deductions with respect to horse activities claimed by petitioner-corporation on its income tax return for fiscal year ended October 31, 1961, were properly disallowed. [22]
Although both parties admit that the intention of petitioners is a factual question, they undertake on brief to examine in depth an abundance of cases in this area. However, a review of those cases will serve no useful purpose since the holdings of those cases were arrived at on the peculiar facts of record therein. Margit Sigray Bessenyey, supra.
In attempting to discover petitioners' motive in conducting the saddle horse activities, we must make this determination not only from *88 the direct testimony of petitioner and his wife as to their intent, but also from a consideration of all the evidence. American Properties, Inc., supra.As we stated in that case: The statement of an interested party of his intention and purpose is not necessarily conclusive. Helvering v. National Grocery Co., 304 U.S. 282, affirming 35 B.T.A. 163. In R.L. Blaffer & Co., 37 B.T.A. 851, affd. (C.A. 5) 103 F. 2d 487, certiorari denied 308 U.S. 576, we stated that one's categorical statement may be of less weight than the facts and circumstances which affect it and that "[to] be skeptical of the weight to be accorded an interested witness' statement in view of other evidence is not the same as wholly to reject the statement as if it were dishonest." Despite this pronouncement, it is clear that we cannot ignore a taxpayer's testimony when it is consistent with other proved facts. See Foran v. Commissioner, 165 F. 2d 705 (C.A. 5, 1948), reversing a Memorandum Opinion of this Court. As to the intention of Stoltzfus to engage in his individual capacity in the horse business, he testified *89 that, after his trip to Emerald Farms in November 1961, he intended to develop the finest American saddle bred horse business in the northeastern United States. However, we construe this testimony, when coupled with other facts, to evidence merely an intention to investigate further the feasibility and potential profitability of entering into the saddle horse business. Some of these other facts are that Stoltzfus was uncertain in 1961 as to whether he should undertake breeding standardbred or saddle bred horses. Furthermore, he was still in the stage of discussion with his family and with Jones, a respected horse man, as to his ambitions in this field. He made trips to Kentucky and other parts of the country during the latter part of 1961, and the first half of 1962, where he visited and observed some successful saddle bred horse businesses. During these visits petitioner had discussions with the owners and managers of these operations in order to gain insight into the advisability of such an undertaking as he was planning. Stoltzfus also attended in the fall of 1961 and the spring of 1962 the Tattersall Sales, a wellknown public auction sale for saddle horses in Lexington, Ky. His *90 admitted prupose in doing this was not to purchase horses but rather to meet people interested in buying saddle horses and to study the types and quality of horse sold and the prices thereof. These facts, in addition to other facts which we have detailed in our findings herein and coupled with testimony which was presented at trial, all lead us to the conclusion that petitioner had in mind in 1961 the possibility of entering into a commercial horse venture at some future time, but 1634 that he did not have the intention of immediately embarking therein. See American Properties, Inc., supra. Accordingly, we hold that Stoltzfus was not engaged in a trade or business with respect to his horse activities in 1961. There was a significant change of events in 1962, however. Since Stoltzfus had decided that the saddle bred horse business had a potential in his area, he no longer saw a need to retain his quarter and appaloosa horses, and a dispersal sale of them was held on April 9, 1962. In the same month, Jones was hired on a full-time basis as trainer-manager of petitioner's saddle bred horse operation. Although petitioner made a rough design for a stable and related *91 facilities in November 1961, it was in 1962 that he directed H. M. Stauffer & Son, construction and building supplies, to prepare final construction drawings and srecifications based upon his rough design. Petitioner wished to acquire Bard's Crossing Farm from his mother for the purpose of constructing his breeding facilities thereon. On October 20, 1962, she made a gift of the land to petitioner. Shortly thereafter, in 1962, construction of the stable was commenced thereon. In the spring of 1963, the horse related facilities were completed. In addition to the aforesaid events, during 1962, Stoltzfus, in pursuance of his desire to undertake a saddle horse operation, instructed Jones to acquire for him a good blood line of brood mares for breeding purposes. On March 5, 1962, Jones succeeded in purchasing for petitioner for $400 a brood mare with good blood lines named Sensation's Last Love. The horse was acquired for such a low price because she was crippled and could no longer be shown. Shortly thereafter, she was sent to Robin Hill Farm in New Jersey to be bred. Petitioner purchased four other horses during 1962 consisting of three untrained geldings and a brood mare named Lady *92 Viola. These horses were purchased by Jones in accordance with petitioner's wishes to look for and acquire not only good breeding stock but also quality untrained saddle horses which could be trained, shown, and developed for sale. All of the aforementioned facts and circumstances, coupled with other facts of record herein, support and are consistent with petitioner's testimony at trial that he was engaged in the business of breeding, raising, training, and selling horses in 1962, with the intention and expectation of ultimate profit therefrom, American Properlies, Inc., supra, and we so hold. The thrust of respondent's argument is that the horse activities were conducted for the personal pleasure and gratification of petitioner, his wife and his daughter, Ruth Louise. [23] The facts simply do not support this assertion. Petitioner's wife did not particularly like horses and, in fact, she testified that she was afraid of them. Furthermore, she disapproved of showing horses on Sunday because of religious reasons. Throughout the years at issue, she had learned to quell her fears, and in 1965 or 1966, she began to drive a fine harness horse for show in amateur classes. *93 Ruth Louise no longer showed horses after 1964, and this precipitated the need for an amateur driver. Crabtree, the manager and trainer of the horse operation, was a professional and could not show horses in amateur classes. Petitioner had had several heart attacks prior to 1961 and was advised not to ride. Therefore, it fell upon petitioner's wife to fill the need for an amateur driver. Ruth Louise was the only one in the family that rode horses. While it is true that she did ride and show horses in amateur classes at various horse shows during the years at issue, we do not find on the record herein that petitioner's primary purpose in conducting a horse operation was to provide his daughter with an opportunity to display her equestrian talents nor to indulge in any social pleasures which may be derived from attending horse shows. Furthermore, while it is true that petitioner has been interested in and engaged in farming and breeding livestock practically all of his life, this fact is not fatal to a finding of a profit-making *94 motive. In fact, it has been observed that "[success] in business is largely obtained by pleasurable interest therein." Wilson v. Eisner, supra, at 42. [24]
Respondent also directs our attention to the losses which have been sustained annually from the horse operation. While it 1635 is true that a record of losses over a period of years may be an important factor bearing on a taxpayer's true intention, Margit Sigray Bessenyey, supra; Commissioner v. Widener, supra; Samuel Riker, Jr., Executor, 6 B.T.A. 890 (1927), we are also aware that: the presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which *95 have meanwhile been sustained in the intervening years. At trial, we had the benefit of the testimony of three witnesses, all experienced in the saddle horse business. While we will not recount all the facts established by their testimony, it did indicate that it is not unusual to experience losses during the formative years of a saddle horse business. It was estimated that five to ten years are required to develop a financially successful saddle horse breeding business. Moreover, several years of development are required in order to build a reputation and to produce and develop quality stock for sale. Colts must not only be produced, but must be started in training in order to show their potential, before it is profitable to sell them. However, it appears that once a saddle horse business becomes well established and establishes the reputation of its breeding stock and colts, it is possible to sell yearling colts without any training. These witnesses further testified as to the appropriate steps that an investor should take in order to start and build a profitable saddle horse business. These suggested steps which were implemented by petitioners were: (a) The investor should *96 employ the services of a person knowledgeable about saddle horses and with a good reputation in the industry for the training and handling of saddle horses. O. Wendell Jones, Sr., now deceased, was consulted by Stoltzfus prior to his decision to enter the saddle horse business. In April 1962, Jones was employed by petitioner on a full-time basis as manager and trainer of the saddle horse operation. He had an excellent reputation at that time as a trainer of, and person knowledgeable with regard to, American saddle horses. In fact, he was generally considered one of the top men in this field in the eastern part of the United States. (b) The investor should provide adequate facilities, including a stable to house the horses, indoor and outdoor exercise areas for training and showing horses to customers and pasture land for grazing. There should also be a separate barn for housing the brood mares. Petitioner very carefully planned the stable and related facilities he intended to build. Construction was commenced late in 1962. Without dwelling on the description of the stable which we have set out in our findings of fact, we shall note that, as constructed, it is not a show place, *97 but rather it is functional, and, in some ways, innovative. Petitioner, who impressed us as a very astute, successful and determined businessman, had invested $90,922.84 in the stable and related facilities by the time they were completed in the spring of 1963. He had the stable so constructed that it could be converted into a motel "if the saddle horse business wouldn't be making any money and he ever wanted to get out of it, * * *." (c) The investor should acquire the highest quality stock available of the following types: (1) quality breeding stock (studs and brood mares) with good blood lines and a record of success in show competition (2) quality young unfinished horses to train, show and sell; and (3) some finished horses to show for the purpose of putting the business' name before the saddle horse purchasing public and to establishe the business' reputation. Geldings are the preferred type in the industry for the latter two categories, since they are the easiest and most popular type of saddle horse to train, show and sell. As detailed in our findings of fact, this is precisely the stock which petitioner acquired. It is clear, therefore, that petitioner has proceeded *98 in a manner which would be recommended to anyone entering the saddle horse business. His conduct fully supports his asserted profit-making intention. Due to the volume of the record herein, we have not set forth all of the extensive evidence produced at trial. However, we have carefully reviewed the entire record and have concluded upon our evaluation of the evidence that petitioner conducted 1636 his horse operation in 1962 with the genuine intention of making a profit therefrom. As to whether petitioner-corporation engaged in the saddle horse business in its taxable year neden October 31, 1962, it is noteworthy that petitioner decided to have MAS conduct the saddle horse business [25] sometime during the last seven months of 1962. This decision was based upon his concern over his heart condition and his desire to have the saddle horse business continue in the event of his death. Stoltzfus consulted the accounting firm of Hatter, Harris & Beittel as to the manner of effectuating the transfer of the assets of his horse business to MAS. *99 He was advised to make January 1, 1963, the effective date of such a transfer. Journal entries were made on the books of petitioner-corporation as of January 1, 1963, to reflect the transfer of the assets at cost basis from the individual petitioner to MAS. An account payable to petitioner was established to reflect the transfer. Subsequent to his decision in 1962 to transfer the saddle horse venture to the corporate-petitioner, Stoltzfus did not purchase any saddle horses for his own personal account. However, MAS did purchase three horses at a cost of $28,900 during its taxable year ended October 31, 1962. These facts lead us to conclude, and we so hold, that petitioner-corporation was not engaged in the saddle horse business during the fiscal year ended October 31, 1962. We view its purchase of these three horses as in anticipation of the eventual take-over of the horse venture from the individual petitioner. However, that take-over was not effectuated until the following year. The tax consequences of this holding are covered later in this opinion under the headings 1961 and 1962. Respondent argues that MAS did not take title to the horses and other equipment transferred *100 by Stoltzfus to it. He takes the position that there was no arm'slength agreement with respect to the transfer and that petitioner-corporation did not pay adequate consideration for the assets transferred since there was no payment to Stoltzfus nor any note or other evidence of indebtedness other than the account payable. We cannot agree with respondent. Our comments with respect to ownership pertain to these horses and assets transferred to MAS by Stoltzfus, as well as to those horses purchased by petitioner-corporation. First of all, we note that the question of whether title passed is not in itself decisive of whether the saddle horse activities constituted a business of petitioner-corporation. It is "merely one of the factors involved in the more important question of whether the corporation did enter into a true business venture * * * for profit." American Properties, Inc., supra, at 1111. The question of ownership does assume importance primarily in determining whether Stoltzfus received additional income as a result of the purchase by MAS of horses and assets used by it in the saddle horse operation. Although we were not presented with any formal documents *101 transferring title from petitioner to MAS, we do not find this fatal to petitioner-corporation's case, for there is other evidence that tends to indicate that title did pass. MAS represented itself as owner of the horses and other assets in question in statements made for purposes of Pennsylvania state taxes levied on property owned by corporations. Furthermore, with relatively few exceptions, the horses were registered with the American Saddle Horse Breeders' Association in the name of MAS as owner thereof. Proper books of account were kept by MAS on the horse operation. Although several newspaper articles listed Morris A. Stoltzfus as owner of some horses claimed to be owned by petitioner-corporation, we do not find that fact determinative since it is easy to confuse and misuse names in a situation such as this where Morris A. Stoltzfus is the sole voting stockholder and principal management executive of M. A. Stoltzfus, Inc. Furthermore, MAS took out insurance policies on the horses alleged by respondent not to be titled to petitioner-corporation. Death benefits payable under these policies were paid to MAS. In summary, we conclude from an examination of the entire record that *102 MAS took title to the horses and equipment transferred to it by Stoltzfus, as well as 1637 to the horses and equipment it purchased with corporate funds. We are satisfied that there was an intention by petitioner to transfer title to MAS, and we do not find that Stoltzfus deliberately held himself out as owner of the horses and assets. Moreover, with respect to respondent's contention, if Stoltzfus had supplied assets to MAS in return for stock, we do not feel that any question would be raised as to the reality of the ownership of the transferred assets to petitioner-corporation. See National Carbide Corp. v. Commissioner, 336 U.S. 422 (1949). The following language in that case is appropriate here: We think that it can make no difference that financing of the * * * [corporation] was carried out by means of book indebtedness in lieu of increased book value of the * * * [corporation's] stock. A corporation must derive its funds from three sources: capital contributions, loans, and profits from operations. The fact that * * *, the sole shareholder, preferred to supply funds * * * primarily by the second ond method, rather than either of the other two, does not *103 make the income earned * * * income to * * * [the sole shareholder]. Of course, the fact that we were presented with no documented evidence of the indebtedness, other than the journal entries of petitioner-corporation, thends to indicate that MAS was the recipient of capital contributions rather than loans. National Carbide Corp., supra. See also American Cigar Co. v. Commissioner, 66 F. 2d 425 (C.A. 2,1933). For purposes of this case, it is sufficient to state that from an examination of the entire record and, in particular, from the facts enumerated herein, we are convinced that petitioner effectively transferred the horses and the saddle horse business to MAS as of January 1, 1963. Moreover, the parties have stipulated as follows: The following journal entries were made on the books of M. A. Stoltzfus, Inc., petitioner, as of January 1, 1963 to reflect the transfer of such assets from Morris A. Stoltzfus, petitioner, to M. A. Stoltzfus, Inc., petitioner * * *. The thrust of this stipulation is that the transfer in question was effective for all purposes. Respondent has made no objection thereto, other than by his general assertions that the *104 transfer was ineffective. Therefore, we do not feel it within our province to disturb the stipulation, especially where, as we have related heretofore, it is amply supported by the evidence of record. Furthermore, with respect to the ownership of other horses involved herein, as we have found in our facts, petitioner-corporation purchased horses for its own account in 1962, and in subsequent years, and there is no question in our mind with respect to the ownership of these horses being vested in petitioner-corporation. Now that we have disposed of respondent's contention with respect to the ownership of the assets of the saddle horse business, we shall discuss the trade or business issue for the remaining two years at issue, viz., the petitioner-corporation's taxable years ended October 31, 1963, and October 31, 1964. [26]
It is clear that Stoltzfus did not desire to conduct the saddle horse business as a sole proprietorship, but preferred to have MAS conduct the business. In this regard, *105 we must bear in mind the Supreme Court's observation that: [When] a corporation carried on business activity the fact that the owner retains direction of its affairs down to the minutest detail, provides all of its assets and takes all of its profits can make no difference tax-wise. * * * The Court went on to say: Undoubtedly the great majority of corporations owned by sole stockholders are "dummies" in the sense that their policies and day-to-day activities are determined not as decisions of the corporation but by their owners acting individually. * * * A careful review and evaluation of the record herein leads us to conclude that MAS carried on in the saddle horse business, transferred to it by petitioner, during the fiscal years ended October 31, 1963, and October 31, 1964. MAS, through its management, manifested a genuine intention to make a profit from that business. Our remarks with respect to these two years will be confined for the most part of a discussion of some of respondent's contentions and our reasons for refusing to accept them. We have already commented upon respondent's assertion that the horse 1638 related activities were undertaken primarily for *106 the pleasure and personal gratification of petitioner and his wife. Respondent contends that if we find the horse operation constituted a business, then it is the business of the individual petitioners and not of MAS. In support of this contention, respondent appears to rely upon the dominion and control which Stoltzfus exercised over petitioner-corporation. Petitioner was the sole stockholder of the only class of voting stock of petitioner-corporation. This means in effect that Stoltzfus controlled that corporation. However, that dominion does not necessarily indicate that the corporation is acting as an agent for its controlling stockholders. See National Carbide Corp., supra. It is well established that if the business activity of a taxpayer is a sham and unreal, the Commissioner may disregard its separate entity for tax purposes. However, it is also settled law that a taxpayer may adopt any form he wishes for the conduct of his business, Perry R. Bass, 50 T.C. 595 (1968), as long as the form selected is a viable business entity. In other words, the taxpayer *107 must have been created for a substantial business purpose and must have actually engaged in substantive business activity. Moline Properties v. Commissioner, 319 U.S. 436 (1943). Certainly, the Commissioner does not argue with the fact that M. A. Stoltzfus, Inc., is a viable business entity, taxable as such since its incorporation in 1957. He suggests, however, that during the years in question MAS was restricted by the terms of its charter to engage in quarry and related activities only, and that, therefore, any activities beyond that were ultra vires and not recognizable as business activities for Federal income tax purposes. We need not decide whether the nonquarry related activities were ultra vires. We note that in Pennsylvania a corporation "shall have unlimited power to engage in and to do any lawful act concerning any or all lawful business for which corporations may be incorporated * * *." Pa. Stat. tit 15, sec. 1204. Since respondent admits that one may be found in proper cases to engage in the business of breeding, training, and selling horses, there is no question as to whether that is a lawful business. The fact that petitioner-corporation is engaged *108 in operations that are beyond the scope of its charter does not transmute the activities in any way. While the Commonwealth of Pennsylvania and the stockholders of MAS may have the right to object to the conduct of activities outside the scope of the corporate charter, respondent cannot impute the breeding and related activities to the controlling stockholder of petitioner-corporation on that basis alone. Furthermore, it was stipulated that if respondent's agent were called upon to testify, he would have testified that, in his opinion, the state charter could be amended to cover almost any activity. We agree. One further note on this matter is in order. MAS has engaged in farming and raising steers and hogs prior to, during, and subsequent to the years at issue. No mention of these activities is found in the corporate charter nor in any minutes of director or shareholder meetings. Nevertheless, respondent has apparently always recognized that operation of MAS for Federal income tax purposes and certainly did so in the years here in issue. Having disposed of the primary issue in this case, we shall proceed to a determination of the subsidiary questions herein. 1.1961 Since *109 we have determined that neither Stoltzfus nor MAS was engaged in a trade or business with respect to the horse activities at any time during 1961, any deductions claimed by them with respect thereto were properly disallowed. Respondent also determined that the cost ($600) of a horse cart and harness acquired for the benefit of Morris A. and Ruth E. Stoltzfus in 1961 constituted additional income to them. It is well established that payments made by a corporation on behalf of a stockholder may constitute taxable dividends to him. American Properties, Inc., supra; Louis Greenspon, 23 T.C. 138 (1954), modified 229 F. 2d 947 (C.A. 8, 1956); and Paramount-Richards Th. v. Commissioner, 153 F. 2d 602 (C.A. 5, 1946). There is no requirement, as petitioner contends, that the dividends be pro rata among all the stockholders of a corporation, particularly in the case of a closely held corporation. See Irving Sachs, 32 T.C. 815 (1959), affd. 277 F. 2d 879 (C.A. 8, 1960), certiorari denied 364 U.S. 833 (1960). *110 1639 We are mindful that respondent's determination is prima facie correct. The individual petitioners have not shown error in the Commissioner's determination that they received $600 additional income in 1961 because they failed to offer any evidence whatsoever with respect to the use or ownership of these assets. Respondent contends that these items were not corporate property, but rather were owned by the individual petitioners. In these circumstances, we are constrained to hold that the corporation expended $600 for the individual petitioners which constituted additional income to them in that year. Cf. Louis Greenspon, supra.
2. 1962 Having held that MAS was not engaged in the horse business in its fiscal year ended October 31, 1962, it follows that any deductions claimed by it with respect to such activities were properly disallowed. Respondent disallowed, among other things, $1,000 in horse insurance expenses and $881.79 in expenses for horse training and shows which were paid for by MAS in 1962. He included the total of these two items in the individual petitioners' gross income as incurred for their benefit. We do not know whether these expenses *111 were incurred with respect to the horses woned by MAS, or with respect to the horses Stoltzfus owned in 1962. These nondeductible expenses incurred by petitioner-corporation may constitute additional income to petitioner only if they were payments made for his benefit, American Properties, Inc., supra, and they constitute payments made for his benefit or pleasure only if they were incurred with respect to the horses he owned in 1962. We fail to see of what benefit expenses incurred by MAS in connection with the horses it owned would be to Stoltzfus. Bearing in mind that respondent's determination is presumptively correct, the expenses incurred by petitioner-corporation are presumed to have been incurred with respect to Stoltzfus' horses because, otherwise, there would be no benefit to him which would warrant inclusion in his income of these disallowed expenses. We hold that the inclusion of $1,881.79 in petitioner's income for 1962 was proper. However, since we have held herein that Stoltzfus engaged in a trade or business of breeding, training, and selling horses in 1962, any expenses incurred with respect to that business would be deductible by him. Therefore, *112 the inclusion in Stoltzfus' income of $1,881.79 would be offset by a corresponding business expense deduction therefrom of a like amount. Respondent also included in the individual petitioners' income for 1962 the cost of five horses ($38,900) purchased and owned by MAS in 1962. We cannot sustain respondent in this. We have held that: While it is appropriate for the respondent to disallow depreciation taken on the farm machinery and equipment owned by * * * [petitioner-corporation], we do not think that the cost of these items should be added to Greenspon's [the dominant stockholder's] personal income. It is not disputed that the title to these items remained with the corporation and, while they may have been used on the farm, Greenspon did not own them, and their cost should not be included in his income. * * * We have found as a fact that MAS owned all the horses purchased by it or for it during the years at issue. Accordingly, we hold that the cost of the five horses purchased by MAS during 1962 should not be added to the individual petitioners' personal income for that year. Louis Greenspon, supra. Since respondent did not raise the question of whether *113 the individual petitioners could be charged with receiving income to the extent of the value of the use of the horses and since we have no facts to determine such value or use, we need not decide that question herein. Louis Greenspon, supra. Since we have held that Stoltzfus was in the trade or business of breeding, raising, training, and selling horses in 1962, we hold that respondent erroneously disallowed the amounts claimed by him in that year with respect thereto. 3. 1963 and 1964 At trial and on brief, the parties agreed that the resolution of the primary issue in this case may be determinative of the subsidiary issues arising therefrom. We agree with them so far as the years 1963 and 1964 are involved. Accordingly, we hold that the issues raised for those years are decided as follows: (a) The deductions claimed by MAS relating to the saddle horse business for its fiscal years ended October 31, 1963, and October 31, 1964, are allowed. 1640 (b) The investment credit claimed by MAS, based on the saddle horse business activities, in the amount of $770 and $105.84 for its fiscal year ended October 31, 1963, is allowed. (c) The net operating loss deduction *114 carryback claimed by MAS from the fiscal year ended October 31, 1964, is allowed, but appropriate adjustments as to the amount of such carryback allowable for each year at issue should be made where necessary in order to reflect the conclusions reached herein as to the primary issue. (d) The individual petitioners received no additional income in 1963 with respect to the saddle horse business of MAS. (e) The individual petitioners are entitled to depreciation deductions in 1963 totaling $2,307.65 on Greystone Manor Stables which was rented by them to petitioner corporation for use in its saddle horse business. (f) The individual petitioners are entitled to an investment credit of $320.54 in 1963 for depreciable furniture and fixtures for Greystone Manor Stables which were leased to MAS for use in its saddle horse business. In order to reflect the concessions made by the parties and the conclusions reached herein, Decisions will be entered under Rule 50. Footnotes
1. Certain adjustments not relating to the horse activities are not contested by petitioners.↩
2. Despite the stipulation by the parties that the dates of rental were the fiscal years ended October 31, 1962, and October 31, 1963, we feel that this was an error in view of the fact that the stable was not completed until the spring of 1963.↩
3. This finding is contrary to the parties' stipulation that the date of sale was April 7, 1962. However, in view of documentary evidence presented to us, we feel the stipulation reflects an error. ↩
4. Wendell C. Jones is the son of O. Wendell Jones, Sr. Despite the parties' stipulation that "Wendell C. Jones, Sr.," was employed in April 1962, other evidence convinces us that there was an error made in the stipulation, and that O. Wendell Jones was employed at that time.↩
5. A finished saddle horse is one already developed and ready to ride; an unfinished saddle horse is a young untrained horse not developed sufficiently to show or ride. Of course, there are stages of development in the training horse between the finished and unfinished stages.↩
6. A gelding is a male horse that has been castrated. Geldings are very popular as show horses, and there is a much larger demand or market for gelded saddle horses than for any other type. At least 50 percent of the saddle horses shown are geldings. They are also easier to train and develop than either mares or stallions because they are not at tempera-mental as these latter horses. Geldings are the most consistent horse available.↩
7. Recorded as an account payable.↩
8. The mare was registered under the name "Lady Esther," but was shown under the name "Madelation."↩
9. Two standardbred colts were also sold at that time.↩
10. It is not unusual that stallions live to be in their late 20's and still provide stud service.↩
11. A "World Championship" in the saddle horse industry is first prize at the Kentucky State Fair.↩
12. A filly is a female horse, usually less than four years old.↩
13. Recorded as an account payable.↩
14. Major's Princess was purschased in foal and foaled a colt named Limestone Major after her acquisition by MAS. Five hundred dollars of the total purchase price of $ 2,500 was allocated as the cost of the foal on petitioner-corporation's books.↩
15. The gestation period is 11 months.↩
16. A gaited horse is generally more valuable and salable than one that has not been gaited.↩
17. Due to net operating loss carrybacks, there was an offset by way of a tentative allowance of $3,669.32 and $248.60 in the fiscal years ended October 31, 1961, and October 31, 1962, respectively. ↩
18. Petitioner claimed a net operating loss carryback deduction of $58,902.27.↩
19. This should be "income."↩
1. This amount was reported by you on your return, Form 1040, year ended December 31, 1963.↩
2. These items representing interest paid on your behalf have not been added to income since you would be entitled to deductions for similar amounts.↩
20. There were other disallowed deductions. However, it appears that petitioners are only contesting the horse related deductions since no argument has been made or evidence presented with respect to the other disallowed amounts. ↩
21. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
22. We also note that, even in the absence of such assertions on brief, we find no evidence to support any claim that MAS was engaged in the trade or business of breeding, raising, training, or selling horses during the taxable year ended October 31, 1961.↩
23. Marianne, petitioner's only other child, refused to ride again because of a frightening experience which happened to her before the years at issue.↩
24. See also Robert E. Currie, T.C. 1969-4, and W. Clark Wise, T.C. Memo. 1957-83↩.
25. Having already held that petitioner's horse operation in 1962 constituted a business, we shall refer to those activities as such.↩
26. Our decision as to these two years will dispose of the individual petitioners' calendar year 1963, which is also in question, and which is discussed infra under the heading 1963 and 1964.↩